Glitterati

incorporated

225 Central Park West  New York, New York 10024
telephone 212 - 414 - 01  212 - 414 - 04??
... ... ... info@Glitterati... ... ... ... ... Prenside... ... ... ...

This Agreement made the 19th day of August, 2010, between Lisa S. Johnson, 9517 Canyon Mesa Drive, Las Vegas, Nevada 89144 (hereinafter the "Author"), and **GLITTERATI INCORPORATED**, having offices at 225 Central Park West, New York, New York 10024 (hereinafter the "Publisher") with reference to a Work, in all printed formats, tentatively titled,

> *"108 Rock Star Guitars"*
> **(hereinafter "the Work"),**
> which is described as follows:

**Original collection to form a book of previously unpublished photographs of rock stars' celebrity guitars including jazz, blues, and country and western guitars, created from Author's personal photographic archives and collection, with a writer-for-hire text by David Rubin that will supplement the photographs with interviews with celebrity guitar-owners or offer biographical profiles of the celebrity owners and conforming substantially to the attached proposal and specifications (Appendices A and B) and scheduled for publication in autumn, 2012, books to deliver by August 1, 2012, and to ship no later than July 15, 2012.**

WHEREBY, in consideration of the promises set forth in this Agreement, the Author and the Publisher agree as follows:

## 1. GRANT OF RIGHTS

(a)  The Author grants to the Publisher the exclusive right to publish, reproduce, and distribute the Work in print, electronic or audio editions, in all formats in all languages throughout the world and to exercise and grant to third parties the rights to the Work described in Paragraph 3 throughout the world ("the Territory") for a term not to exceed seven (7) years from the date of contract until or unless such a date that is mutually agreeable to Author and Publisher. The Author also grants to the Publisher the sole and exclusive right to advertise and promote the Work including, but not limited to, the right to print, publish, license and/or sell excerpts and/or portions of the Work in whole or in part. The Author acknowledges that Publisher shall have the right to co-publish, license or assign rights to trade or special editions of the Work to one or more Publishers and that all of the foregoing are to aid in the promotion and sale of the Work.

## 2. MATERIALS and CONTENT DELIVERY

(a)  Timely delivery of complete materials for the Work is an essential condition of this Agreement and is essential consideration for the Publisher's obligations hereunder. Accordingly, the parties hereby agree as follows:

1

1.    The Author shall deliver final mechanicals final mechanicals of the Work to the Publisher according to the attached Production Schedule (Appendix C), which shall include full layouts of the text, illustrations, high resolution photographs, and design for a Work which Publisher intends to publish in printed hardcover volume format throughout the world under Publisher's imprint. The Work will be comprised of all of the above elements and to be performed and finalized as agreed by Publisher and Author. The title and cover design of the Work are to be mutually agreed between Author and Publisher. The Publisher agrees to suggest several possible designers whose published books the Author may examine prior to her selection of a designer.

      (a) Final artwork shall consist of approximately 300 four color photographs from the Author's archives, personal collection, and shot by the Author, all to be mutually agreed and created by Author for the Work.

      (b) Agreed text matters will include introduction, and back matter, or as otherwise mutually agreed, the textual material, prepared in accordance with Publisher's requirements on disk in Word format. The textual material will consist of numerous interviews and biographies of the guitar owners, along with any other text materials to be written by the Author (including possible Foreword, Preface, Introduction and back matter explanations), each in a form and length to be mutually agreed, along with any captions for the images. An initial layout with all artworks and placements of types shall be presented as agreed and delineated in Appendix C, attached.

      (c) The design elements for the Work, having been developed by designer to be named but selection of which to be mutually agreed by Author and Publisher, will include finished mechanicals of the Work along with printer-ready high-resolution images of all the artwork, at a minimum of 350 dpi to the size to be used in the Work. Author will be responsible for compensating the designer for all his/her/its fees and costs. Design of the Work is subject to Author's and Publisher's mutual approval, said approval not to be unreasonably withheld by the Publisher. Publisher and Author will mutually approve the early design first layout, as specified in Appendix C, attached, which will be consist of an early layout with low resolution artwork in place, and dummy or uncopyedited texts and captions, for mutual agreement. Upon mutual approval of the rough layout, the designer proceeds to drop in the images and text; designer will send small sections of proposed final spreads to you as they become available, for your feedback and mutual approval.)

      (d) Author will bear sole responsibility for payment of any and all fees, costs and royalty payments, if any, that are required to obtain the above text, photographs, illustrations and design elements for the Work and to acquire all rights needed for the Publisher to use them in publishing the Work in the manner contemplated under this Agreement. The Publisher shall provide the Author with a sample "work-for-hire" agreement (see Appendix D, attached), for all text-related materials, so that the Author shall pay a one-time fee to each contributor, but no future royalties to him/her. Further, the Publisher shall provide the Author with a sample permissions agreement (see Appendix E, attached), to be used in the event that the Author wishes to license an image or photograph or illustration from an artist. Said permissions shall be granted to the Author by the permissions' holders for the Term of Copyright of the Work and shall be made one time only to said permissions' owners.

(e) Author agrees to retain copies of all photographs, textual materials, illustrations and design elements and other materials submitted by Author or the third party content providers (e.g., photographers, designers, writers, etc.) to Publisher and agrees that Publisher shall not be liable for any loss resulting to Author or other content providers from the destruction or loss thereof. Author will obtain the same assurances from all providers of art and photography which Author is providing for the Work. The Author shall always have back-up copies of her own images, and, in the event that she licenses the rights to use other photographers' and/or illustrators' images, she will obtain camera-ready copies of all original artwork from these permissions' holders and shall include, in her agreement with each rights' holder, language that protects her against any potential loss or damage to the image(s) that she is licensing.

(f) It is understood and agreed that there may be other contributors to provide text materials, who may write a foreword or preface essay to the Work, such contributors to be mutually agreed between Publisher and Author, such agreement not to be unreasonably withheld by the Publisher. Any contributors' fees will be paid by Author, as will all fees for the construction and publication of a finished copy of the Work, which will be distributed to the trade by Publisher.

(g) The Author shall, at the Author's expense, obtain all permissions required by the Publisher for any artwork or text from other sources which are subject to copyright, to be included in the Work by the Author. In the event that the Publisher should desire a copy of said permissions, the Author agrees to send a copy of said permissions to the Publisher, either by electronic scan or by photocopy.

(h) If the Author fails to deliver the text, artwork, and/or permissions required by this paragraph , Publisher and Author shall mutually agree to a new delivery date, with the understanding that, in the event that the publication date of the Work needs to be rescheduled, the book may need a revised promotion and publicity as a new launch date is settled upon.

(i) It is understood that Publisher and Author will collaborate and mutually agree on every aspect of the production of the Work, so that delays will not be incurred in the procession of the production of the Work and that the Work will be produced in a manner that is acceptable to the marketplace as understood by the Publisher and acceptable to Author as a creative expression of her artistry.

## 2. PUBLICATION

(a)(i) Publisher will publish the Work in a manner that is consistent with the quality of other Works published by Publisher and will place the Work in its distributor's catalogue and distribute the Work through its distributor. Publisher will communicate and coordinate with the distributor in the same manner as it does in connection with all other Works on the Publisher's list. Publisher will annually (by March 31) provide Author with sales and inventory reports as provided to Publisher regarding the Work by the distributor.

(ii) In addition Author grants to Publisher the exclusive subsidiary and ancillary rights in the Work including but not limited to, the net proceeds of which after any third party expenses shall be split with Author on a fifty-fifty (50/50) basis at the end of each accounting period set for in paragraph 7 below, said splits to begin only after Author's upfront investment has been recouped:

    (a) print and electronic first and second serial rights

    (b) print and electronic permissions

    (c) print and electronic condensations and abridgements

    (d) print and electronic book club rights

    (e) print (paperback and hardcover) and electronic reprint editions

    (f) audio editions

    (g) electronic rights of every kind and nature;

    (h) print and merchandize rights, to be negotiated in good faith between the Author and the Publisher on an item-by-item basis, but with final approval to be reserved for the Author  (i) translation rights

    (j) British Commonwealth rights

(b)  Publisher will consult with and assist Author on the organization of overall editorial strategy, selection of photography, and will provide editing of the text, copy editing, proofreading, indexing and other back matter as agreed between the parties, the design to be provided by designated designer, layout, covers, editing of captions and final pre-press and the selection and supervision of the printer. These services shall be included by the Publisher as part of the overhead payment payable by the Author to the Publisher.  It is understood that Publisher bears no responsibility for permission to artwork or texts contained in the Work.  Every effort will have been made to avoid errors and omissions and will be stated as such on the copyright page in a standard "Errors & Omissions" clause.

(c)  The parties will collaborate on the preparation of a comprehensive budget for publication of the Work subject to the approval of both parties.

(d)  Publisher may arrange to have its publicist, at Author's expense, if Author so desires, handle publicity for the Work in the same manner as is provided for other similar Works published by Publisher; or Author may supply Author's own publicist to provide publicity and provide the work product to Publisher.  Specific publicity endeavors will include writing press releases, receiving and fulfilling requests as well as soliciting reviewers for promotion, mailing and following up on review copies, creating electronic media "buzz" through Facebook and Twitter, and initiating publicity and promotional programs to publicize the Work, including lectures and presentations by Author, the creation and execution of which will be shared by the Publisher and Author.  These publicity activities will be shared by the Publisher's in-house publicist and the Author's independent publicist, who should receive back-up support from the in-house publicist with all print materials, blads, press kits, etc., in order to facilitate her/his own efforts. It will be mutually determined, should there be two publicists working on the book, which shall approach media buyers and bookers, so that there is no repetition of services and the process is collaborative.  All services to be provided by publicists will be arranged for and paid for by Author whether the publicist is provided by Publisher or independently by Author. Publisher's suggested print run for the Work trade is 5,000 copies for worldwide English language, but the decision of the print run will be determined solely by Author, after receiving a detailed costing from the Publisher, so that the Author knows about unit costs on an incremental basis. The Author may choose a larger print run, depending on the discount volume received by the Publisher from the Printer based on unit copies ordered.)

(e) Publisher shall consult with Author to set the retail price for the Work, first and all subsequent print runs, international distribution by Publisher's distributor outside of North America.

(f) Publisher will not be obligated to distribute any Work which in the opinion of its counsel, is libelous or violates any obscenity laws or any statutory or common law copyright, trademark right, or other right or legal interest of any third party, or any federal, state of local statute or regulation.

(g) Publisher will undertake all of its obligations with respect to the Work in the same manner and with the same degree of care and skill as Publisher performs for its own publications.

## 4.    FUNDING

(a) The Author will underwrite the cost of the production and printings of the Work in their entirety, with a subsidy as specified and agreed in budget. Publisher will invoice Author for all expenses incurred in the publication, shipping, production, marketing, and distribution of the Work pursuant to the budget established, which will be subject to change only by mutual written agreement. Such expenses shall be paid from an interest-bearing operating account (interest to accrue to the account) established and maintained by Publisher on Author's behalf. Print manufacturing costs will be immediately budgeted and approved by Author as soon as the final specifications are mutually agreed by Author and Publisher after the signing of this contract, so that the largest costs to be borne by the operating account can be estimated in the most timely fashion and mutually agreed by Author and Publisher. Author shall establish this account with an advance payment of Twenty-Five Thousand dollars ($25,000). Once the Work has been published, Publisher will remit any excess monies from this account to the Author, no later than 90 days after publication of Work. The Author's operating account shall be periodically replenished by Author in accordance with a budget established by Publisher and approved by Author, as needed. In increments of $5,000, Publisher shall provide expense accounts to Author, who will review and supplement the fund. It is understood that this fund is to be used exclusively to fund every aspect of the project and will be held by Glitterati but supplied in entirety by Author, who will determine in conversation and mutual agreement with Publisher reasonable fees to be paid to suppliers and will replenish the fund at her discretion.

(b)    Publisher shall charge an additional fee to Author, as its only fee, in the amount of One Hundred Thousand dollars ($100,000) for its services as Publisher as outlined above and shall be payable as follows:

> i.   Twenty-five Thousand dollars ($25,000) upon execution of this Agreement;
> ii.  Twenty-five Thousand dollars ($25,000) upon approval of first design layout;
> iii. Twenty-five Thousand dollars ($25,000) upon approved printer's proofs;
> iv.  Twenty-five Thousand dollars ($25,000) on delivery of finished copies of the Work to the Publisher

(c) Publisher will distribute the Work through its distributor, and fulfill the standard and normal functions of the Publisher for the Work. It is understood that all out-of-pocket expenses and direct costs in connection with the Work, including all costs of publication (among them editorial, layout, paper, printing, binding and distribution, etc), marketing (including publicity), and distribution, will be paid by Author either directly or via the Publisher's operating account funded for that purpose by Author. The fee above subparagraph in 4 (b) is paid solely for the services furnished by Publisher and it is not intended to cover any of the costs and expenses referred to in subparagraphs 4 (a) and (c). Publishers services shall

5

include those enumerated in Appendix F, attached, and shall be separate and distinct "production expenses" that will be included in a budget separate from the $100,000 fee to be paid to Glitterati; said budget will be

(d) All payments to author as delineated in Paragraph 7 of this agreement conform to the mutually agreed terms between Author and Publisher so that that all sums of money collected by the distributor, minus their distribution fee (which are specified in Appendix G, attached) are payable directly to Author by Publisher and Publisher does not receive a portion of the proceeds received from the distributor. All Publisher's earnings shall come from the fee of $100,000 fee specified in (b), above.

## 5. TITLE TO WORK

(a) Publisher acknowledges that the copies of the Works delivered to Publisher pursuant to this Agreement will remain the property of Author until sold by Publisher. Publisher agrees that Author may file any documents which Author deems necessary to reflect said ownership by Author and Publisher will execute any documents required to acknowledge said ownership. Publisher's distributor will maintain insurance on the Author' inventory to the extent that such insurance is maintained by Publisher for its own similar Works and to the extent that such insurance is permitted under Publisher's policy. All copyrights in the materials contained in the Work are owned by Author as are the copyrights and trademarks associated with the title of the Work (to the extent that there can be any copyright or trademark in a title), subject to the exclusive license hereby granted by Author to Publisher as is required for Publisher to perform all of its duties and exercise all of its rights hereunder. The license granted to Publisher is exclusive subject to the terms of this Agreement.

(b)While the Work in published form is located in Publisher's distributor's warehouse, Publisher's distributor assumes responsibility for loss or damage to copies of Works in its custody in excess of approximately five percent (5%) of the total number of copies of all Publisher's Works located therein, provided however that its total liability shall not exceed an amount equal approximately twenty percent (20%) of the total suggested list price for the lost or damaged Works. To the extent that Publisher's distributor assumes such responsibility for such loss or damage and compensates Publisher for it, Publisher will credit Author accordingly. If Author so chooses, she may insure her books for greater value than 20% of the Publisher's suggested list price.

(c) Publisher, through its distributor, shall guarantee all receivables generated from its sale of Author's Work to the full extent that Publisher's distributor does so and makes payment to Publisher on such guarantee. In the event Publisher notifies Author that Publisher or its distributor will not ship to a customer, then Author shall be at the risk of bad debts resulting from shipments authorized by Author in spite of such notice (including reasonable collection expenses) through Publisher's deduction thereof from any amounts due to Author. The Publisher, in conjunction with its distributor, shall make every commercially feasible effort to have books available for all author appearances in promotion of the Work, with a volume of books commensurate to the estimated number of books projected to sell at each event. Further, the Author shall have the right to order any number of her own book, at any time, at no expense to her, but she agrees to pay freight FOB from your distributor's warehouse.

## 6. RETURNS

(a) All Works distributed hereunder will be sold subject to issuance of full return credit. Returns will be made in accordance with Publisher's and its distributor's standard policies and procedures. Returns

will be shipped to warehouse during the term of this Agreement and for six (6) months following termination thereof, subject to the terms and requirements of Publisher's agreement with its distributor.

(b)  Publisher and its distributor will be entitled to allow customers to make unlimited returns and will request customers to make returns in saleable condition, but will not be liable if copies are returned in non-saleable condition. As between Author and Publisher, Author shall at all times during and after the term of this Agreement remain responsible for all credits for returns of Works, said credits to be deducted from the monies payable to the Author from the Publisher.

(c)     Publisher shall be entitled to keep a reasonable reserve for returns to reflect market conditions. Such reserve shall be adjusted from time to time in accordance with Publisher's distributor's reserves, returns and receipts and accounted for on each statement to Author.

## 7.     PUBLICATION PROCEEDS AND ACCOUNTING

(a)     Following first publication of the Work by the Publisher, an accounting of all of all monies received by Publisher from its distributor from the sale of the Work less all costs incurred by Publisher in accordance with the terms of this Agreement accompanied by payment of amounts due on such accounting, which shall be rendered to Author semi-annually, and no later than March 31 of each year for the period July through December of the preceding year and no later than September 31 for the period January through June of the current year; provided that the Publisher need not send accountings if the amounts due to the Author are less than $100, unless requested in writing by the Author.

(b)     Any sums owed by the Author to the Publisher under this Agreement may be deducted from any sums due the Author by the Publisher under this or any other agreement between them, provided that the Publisher sends a written accounting of said deductions to the Author, with an explanation for the deductions.

## 8.     RIGHT TO AUDIT

(a)     The Author may upon written notice and through accountants experienced in the U.S. publishing business examine the Publisher's records relating to the Work during normal business hours under such conditions as the Publisher may reasonably prescribe. An audit with respect to any accounting statement shall not begin later than 12 months from the date said statement was sent to Author, nor shall an audit continue for longer than 5 consecutive business days, nor shall audits be made more frequently than once annually nor shall the time period or the records supporting any such statements be audited more than once. If an error is discovered as a result of any such examination, the party in whose favor the error was made shall promptly pay the other the amount of the error. Any such examination shall be at the Author's expense unless errors of accounting in the Publisher's favor amounting to 5% or more of the total sum paid to the Author under the statement(s) being audited are found, in which event the Publisher shall reimburse Author for the cost of the examination up to the amount of the underpayment found as well as repay the underpayment. The Author or her representative shall have the right, during such audits, to make photocopies of all financial and business records relating to the Work.

## 9.     WARRANTIES AND INDEMNITIES

Author warrants to the Publisher that nothing herein shall be deemed to constitute this a joint venture or partnership between the parties. Neither party shall have the right to bind the other in any manner,

7

except as otherwise specifically provided herein, and nothing herein contained shall give, or is intended to give, any rights of any kind to third persons, except with respect to third parties who assist Publisher in performing its duties hereunder and further warrants that:

    (i) the Author is and will be the sole author of the Work and sole owner of the rights granted in this Agreement or has secured those rights and has not assigned, pledged, or otherwise encumbered them and has the right to enter into this Agreement and to perform Author's obligations hereunder without incurring liability to any third party;

    (ii) the Work is and will be an original work (except to the extent that it includes previously published material for which written permissions have been delivered as required hereunder), has never before been published in whole or in part in any form in the Territory, is not in the public domain in any country in the Territory, and does not and will not infringe any copyright or any other proprietary or personal right; and

(iii) the Work contains and will contain no material that is libelous, obscene, injurious to health, in violation of any right of privacy or publicity, or in violation of any copyright or proprietary right or otherwise contrary to law or harmful so as to subject the Publisher to liability to a third party.

(b)    The Author shall indemnify the Publisher, its distributors, employees, licensees, agents and any retailer from any loss, damage, expense (including reasonable attorneys' fees and expenses), recovery or judgment arising from any breach or alleged breach of any of the Author's warranties, subject to the limitations stated below:

    (i) Each party shall promptly inform the other of any claim made against either which, if sustained, would constitute a breach of any warranty made by the Author to the Publisher in this Agreement. The Publisher shall defend any such claim made against the Publisher with counsel of the Publisher's selection. The Author shall fully cooperate with the Publisher in such defense and may join in such defense with counsel of the Author's selection at the Author's expense.

    (ii) If the Publisher wishes to settle on its own behalf any claim made against the Publisher, the Publisher shall consult with the Author and give serious consideration to any objections the Author may have, and the Author and the Publisher shall attempt in good faith to agree in writing on the percentage of any such settlement costs and defense costs which each shall bear. Failing such agreement, the Publisher may on its own behalf settle any such claim made against the Publisher on terms the Publisher deems advisable. In such event, the Publisher may recover from the Author amounts paid in settlement and defense costs if such costs are incurred because of a breach of warranty made by the Author to the Publisher in this Agreement. Alternatively, the Author may, at the Author's discretion, provide security reasonably acceptable to the Publisher for the amount of the settlement at which Publisher wanted to settle plus the incurred and projected costs of defending the claim, in which event the Publisher shall not settle without the Author's written consent.

    (iii) If any such claim is successfully defended, the Author's indemnity shall be limited to 50% of the costs (including reasonable attorneys' fees and expenses) incurred by the Publisher in the defense of the claim.

(iv) If any such claim is made, the Publisher may withhold payments due the Author under this Agreement to cover the Author's obligations stated above. (Amounts withheld shall be reasonably related to the Publisher's reasonable assessment of the damages claimed and of the anticipated defense costs.) The Publisher shall deposit monies so withheld in an interest-bearing account pending disposition of the claim; monies withheld and the interest thereon will be first applied to satisfy the Author's obligation to indemnify the Publisher, and the balance remaining shall be promptly remitted to the Author after final disposition of the claim or after the claim has in the Publisher's opinion been abandoned.

(c) The Author shall be responsible for any claims made against any third party to which the Publisher grants subsidiary rights to the Work to the same extent as the Author is responsible to the Publisher under the indemnification provisions of this Agreement. The warranties and indemnities made by the Author in this Agreement shall survive the termination of this Agreement.

(d) Prior to the first publication of the Work, the Publisher may have the Work read by the Publisher's counsel at the Publisher's expense. If the Author will not make changes recommended by the Publisher's counsel, the Publisher shall not be required to publish the Work.

## 10. RESERVED RIGHTS AND NON-COMPETITION

(a) All rights to the Work not granted to the Publisher in this Agreement are reserved by the Author. In exercising such rights, the Author shall reserve for the Publisher's benefit the rights granted to the Publisher in this Agreement.

(b) During the term hereof, the Author shall not publish, or permit to be published, any Work of similar subject that would in the opinion of the Publisher compete in the market place with sales of the Work or detract from sales of the Work. The Publisher understands and agrees that the Author has plans to expand the use of her images to a wide range of products and that both the Publisher and the Author enter into this Agreement knowing and agreeing that the Author retains the right to pursue these additional projects, not to exclude additional books on guitars that repeat the contents of the Work as defined in this Agreement.

## 11. COPYRIGHT

(a) The Publisher shall print a copyright notice in conformity with the United States Copyright Act and the Universal Copyright Convention in the name of the Author in each copy of the Work produced, with a copyright for artwork credited to the Artist, and shall require its licensees to do the same. The Publisher shall register the copyright of the Work in the Author's name with the United States Copyright Office promptly after first publication and shall concurrently send a written copy of this registration to the Author.

(b) All references to copyright in this Agreement shall reflect any amendment made subsequent to the date of this Agreement in the copyright laws of the United States, in any international copyright conventions or in the copyright laws of any other country within the Territory. Both parties shall execute such documents as the Publisher may request to effectuate copyright to the Work in accordance with this Agreement.

9

(c)     In the event of any infringement of the copyright of the Work or of any of the exclusive rights granted to the Publisher hereunder, the Publisher may employ such remedies as it deems advisable and may name the Author a co-plaintiff in any litigation the Publisher may commence. The Publisher shall bear the entire expense of any such litigation. Any recovery shall be applied first to reimburse the Publisher for its expenses; the balance shall be divided between the Author and the Publisher as follows: that portion which is based on actual damages shall be divided in proportion to the losses from such infringement suffered by each, and that portion which is based upon the infringer's profits, statutory damages, or punitive damages shall be divided equally.

## 12.     AUTHOR'S RIGHTS OF TERMINATION

(a)     If the Publisher does not produce the Work within the time specified in Paragraph 4(a) for reasons other than first serial or book club use, delays of the Author, or delays caused by circumstances beyond the Publisher's control, and if the Publisher at any time thereafter receives written notice from the Author demanding publication, the Publisher shall within ninety (90) days of the Publisher's receipt of such written demand either publish the Work or revert to the Author in writing all rights to the Work granted to the Publisher in this Agreement and return monies mutually agreed that have been paid to Author through the Publishers Services noted in Appendix F, attached.

(b)     The Work shall be considered out-of-print if no edition as specified above in Grant of Rights, is available for sale through ordinary channels of the Work trade in North America from the order fulfillment department of the Publisher's distributor (as specified in Appendix G, attached) or a licensee of the Publisher, and no license is in effect which provides for the distribution within six (6) months from the date of the Author's request of an edition of the Work through ordinary channels of the Work trade in North America.

## 13.     FORCE MAJEURE

(a)     The failure of the Publisher to publish or reissue the Work shall not be a breach of this Agreement or give rise to any right of termination or reversion if such failure is caused by restrictions of governmental agencies, labor disputes, inability to obtain materials necessary for manufacture of the Work, or any other reason beyond the Publisher's control; in the event of delay from any such cause, the publication or reissue shall be postponed for a period of time reasonably related to such cause.

## GENERAL PROVISIONS

15.     No advertisements shall be included in any edition of the Work published by the Publisher or under the license from the Publisher without the Author's written consent.

16.     The Publisher may use the Author's name, likeness, and biographical data on any editions of the Work published by the Publisher and in any advertising, publicity, or promotion for the Work in any medium and may extend these rights in connection with grants of the subsidiary rights made by the Publisher.

18.     The Author agrees to cooperate, and to be available, in connection with the Publisher's requirements regarding the promotion, publicity, and advertising of the Work, including without limitation being available to make appearances and/or to grant interviews in connection with publication

of the Work if requested by the Publisher. Author agrees to said availability only if the Publisher's requests are made in a reasonable, timely fashion and that the Author agrees, in consultation with the Publisher, that her presence would benefit sales of the Work commensurate to the expenses incurred by her in order to make herself available for such appearances.

19.     (a) If the Publisher is required by law to pay to any U.S. or foreign government taxing authority any portion of amounts due the Author under this Agreement, such payments shall be deducted from the amounts due the Author hereunder.

(b) If any foreign taxes, bank charges, transaction costs or collection costs are incurred or imposed in connection with any payments due the Publisher from the exercise of any right granted in this Agreement, the appropriate allocation of proceeds between the Publisher and the Author from the exercise of such rights shall be made on amounts received after such charges have been paid.

20.     This Agreement shall be binding upon and inure to the benefit of the heirs, executors, or administrators, and assigns of the Author and the successors and assigns of the Publisher, and may not be assigned by either party without the written consent of the other party, except after acceptance by the Publisher of the complete manuscript and permissions, the Author may, subject to the Publisher's retention, assign the Author's right to receive payment under this Agreement upon written notice to the Publisher.

21.     If, under any provision of this Agreement, the Publisher is required to obtain the Author's approval, such approval shall not be unreasonably withheld or delayed. If the Publisher fails to receive a written response from the Author within fourteen (14) business days from the Author's receipt of the Publisher's request for approval as the Publisher may reasonably designate to accommodate its schedule for publication, promotion, or the exercise of rights when any approval is requested, the approval requested shall be deemed granted.

22. This Agreement contains the entire understanding of the Author and the Publisher with reference to the Work; there are no warranties other than those expressly stated in this Agreement. No waiver or modification of any provision of this Agreement shall be valid unless in writing and signed by both parties. No waiver of any breach shall be deemed a waiver of any subsequent breach, or of a breach of any other provision of this Agreement. If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions shall not be affected.

23. The state or federal courts in the City and County of New York (and courts with appellate jurisdiction there from) shall have exclusive jurisdiction of all disputes concerning or relating to this Agreement, its interpretation, performance by the parties and/or any breach thereof, and venue in such courts is proper and convenient.

IN WITNESS WHEREOF, the parties have signed this Agreement to be effective as of the date first stated above.

Glitterati Incorporated, by: __*MH.  8|25|16*_____
                         Marta Hallett, President
Lisa S. Johnson: ___*Lisa S. Johnson*_____
Author's Social Security Number(s): ___*094  70  9287*_____
Author's Citizenship(s): ___*USA*_____ Author's Birth Date(s): _*10-20-63*_____
(This information is needed for copyright purposes)

11

## APPENDIX A  Book Proposal

**Current List of Guitars Already Photographed**

**Proposed List of Guitars You Wish to Photograph**

## APPENDIX B SPECIFICATIONS
## (To Be Mutually Agreed and Following are Tentative)

| | |
|---|---|
| Title | 108 Rock Star Guitars (Regular Book) |
| Size | 10 ¼ x 11 » hardcover, (oblong/landscape size) |
| Extent | 288 pages) |
| Printing | Text:  4x4c on 170gsm matt artpaper |
| | Ends:  4 x 4c on 140gsm woodfree paper |
| | PLC:-  arlin (imitation cloth 1x0c) or pob printing 4 x 0 |
| | Jacket:  4x0c on 170gsm glossy art paper + 1/s glossy Lam |
| Words: | At least 10,000 including captions |
| Art/Illustrations: | At least 300, original four color photographs supplied in digital format of 350 dpi to page size size used in final Work or in 35mm slide format to be determined before final mfg. quotation is supplied |
| Binding | Hardback : Text folded, gathered and threadsewn, separate ends, cased in 3 piece over 3.5mm board, cloth spine with printed types square back with H/T band and shrink wrapped |
| Packing | Packed in export carton and palletized |
| Delivery | CIF New York port, estimated to be August 2012 |

Deluxe Edition Book     All to be mutually agreed in terms of design, manufacture and costing and to be paid by Author as run-on printing to regular edition book (above)

| | | |
|---|---|---|
| Deluxe Book | PLC: | real cloth  + foil stamping on front and spine |
| | Sell sheet: | 4x0c on (#Ultra-Fine 3425-403), blow in and individually signed by artist(s). |
| | Jacket : | 4x0c on 170gsm artpaper with French Fold + 1/s matt Lam |
| | Box: | Real cloth-covered clamshell box, with debossed 4/c photo with glossy lamination Photo on top cover of box; inside box printed (1x0c – match real cloth), blind stamping on top and spine of box. Inside Box ribbon pull out, deluxe edition book inserted inside & signed print inserted inside affixed to top of box, removable sticker sell sheet, 4x0c affixed to back of box. Entire box shrink wrap individual |
| | | Sugg. List Price: $TK |

| | |
|---|---|
| Packing | Packed in export carton and palletized |
| Delivery | CIF Author's Port of choice, August 2012 |

Additional possible sales and promotional materials (to be mutually agreed and paid by Author from production fund:
Sales blad (8 pages)
Press kits
Postcards
Invitations
Including any Work-specific printed materials ie, bookmarks, buttons, mini books as giveaways: (all pricing to be determined)

13

# APPENDIX C  PRODUCTION SCHEDULE

Production Schedule of Materials to Publisher for Processing and Review and Mutual Agreement to proceed to next step in Production Process

|  | *Due Date* |
|---|---|
| FPO Low Res art, draft manuscript | February 2011 |
| First Layout with FPO art and uncopyedited manuscript and captions | May 2011 |
| Final Mechanicals with High Res art and copyedited ms. and captions | January 2012 |
| Final Proofs | April 2012 |
| Printed books ex printer | July 2012 |
| Delivery port of NY | August 2012 |
| Publication date | September 2012 |

# APPENDIX D  SAMPLE WORK FOR HIRE AGREEMENT

This Agreement made the DATE, by and between WRITER and ADDRESS (hereinafter the "Writer"), and LISA JOHNSON, having offices at LOCATION (hereinafter the "AUTHOR") with reference to a work, in two printed formats, tentatively titled,

*" TITLE'"*
(hereinafter "the Work"),

which is described as follows:

<u>Description, with a text by the Writer, and conforming substantially to the attached proposal/contents in Appendix A.</u>

WHEREBY, in consideration of the promises set forth in this Agreement, the Writer and the Author agree as follows:

1. Title and Copyright Assignment

(a) The Writer and Author intend this to be a contract for services and each considers the products and results of the services to be rendered by the Writer hereunder (the "Work") to be a work made for hire. The Writer acknowledges and agrees that the Work (and all rights therein, including, without limitation, copyright) belongs to and shall be the sole and exclusive property of Author.

(b) If for any reason the Work would not be considered a work made for hire under applicable law, the Writer does hereby sell, assign, and transfer to the Author, its successors and assigns, the entire right, title and interest in and to the copyright in the Work and any registrations and copyright applications relating thereto and any renewals and extensions thereof, and in and to all works based upon, derived from, or incorporating the Work, and to all income, royalties, damages, claims and payments now or hereafter due or payable with respect thereto, and in and to all causes of action, either in law or in equity for past, present, or future infringement based on the copyrights, and in and to all rights corresponding to the foregoing throughout the world.

(c) The Writer's full name shall be credited on the cover and title page of the Work.

(d) The Writer agrees to execute all papers and to perform such other proper acts as Author may deem necessary to secure for Author or its designee the rights herein assigned.

2. Delivery of the Work

(a) The Writer will deliver to the Author on or before DATE (a) one typewritten, double-spaced copy of the complete English-language manuscript for the Work approximately 20,000-25,000 words in length, including captions, and rough jacket flap copy, acceptable to the Author on a pc or mac-formatted computer disk; in final form, as further specified by the Author (no hard copy manuscript is necessary).

(b) If the Writer fails to deliver the Work on time, the Author will have the right to terminate this agreement and to recover from the Writer any sums advanced in connection with the Work. Upon such termination, the Writer may not have the Work published elsewhere.

3. Quoted Material

With the exception of short excerpts from others' works, which constitute fair use, the Work will contain no material from other copyrighted works without a written consent of the copyright holder. The Writer will obtain such consents at their own expense after consultation with the Author and will file them with the Author at the time the Work is delivered. Any obligations associated with permissions will be the responsibility of the Writer.

## 4. Writer' Warranty

The Writer warrants that she is the sole owner of the Work and has full power and Writer to make this agreement; that the Work does not infringe any copyright, violate any property rights, or contain any scandalous, libelous, or unlawful matter. The Writer will defend, indemnify, and hold harmless the Author and/or its licensees against all claims, suits, costs, damages, and expenses that the Author and/or its licensees may sustain by reason of any scandalous, libelous, or unlawful matter contained or alleged to be contained in the Work or any infringement or violation by the Work of any copyright or property right; and until such claim or suit has been settled or withdrawn, the Author may withhold any sums due the Writer under this agreement.

## 5. Consideration

(a) In consideration for delivery of the Work in accordance with the provisions of this Agreement, Author shall pay the Writer the sum of $5000 payable as follows:

- $00.00 no more than 30 days after signature of this agreement;

- $00.00 no more than 30 days after the Author's receipt and written acceptance of the manuscript and disk for the Work as outlined in clause 2 (a).

## 6. Revisions

This paragraph has been deleted because the Writer contribution is not a work expressing academic expertise requiring periodic review and revision.

## 7. Term and Termination

(a) This agreement shall remain in effect for the term of copyright of the Work and as long as the Work remains in print in any edition throughout the world.

(b) In the event that either party shall be in default of its material obligations under this agreement and shall fail to remedy such default within thirty (30) days after receipt of written notice thereof, this agreement shall terminate upon expiration of the thirty (30) day period.

(c) Upon the expiration of the term of this agreement, the parties may agree to renew this agreement upon the same terms and conditions as set forth herein.

## 8. Options/Contracts with Third Parties

Nothing contained in Section 7 shall affect any license or other grant of rights, options, or agreements made with third parties prior to the termination date or the rights of the Author in the income resulting from such agreements.

## 9. Amendments

The written provisions contained in this agreement constitute the sole and entire agreement made between the Writer and the Author concerning this Work, and any amendments to this agreement shall not be valid unless made in writing and signed by both parties.

## 10. Construction, Binding Effect, and Assignment

This agreement shall be construed and interpreted according to the laws of the State of New York and shall be binding upon the parties hereto, their heirs, successors, assigns, and personal representatives; and references to the Writer and to the Author shall include their heirs, successors, assigns, and personal representatives.

IN WITNESS WHEREOF, the parties have signed this Agreement to be effective as of the date first stated above.

16

AUTHOR

By: _Lisa Johnson_
Lisa Johnson

_____
, Writer

Writer's Social Security Number: _____
Writer's Citizenship: _____
Writer's Birth Date: _____
(This information is needed for copyright purposes)

# APPENDIX E  SAMPLE PERMISSION FORM

Permission Agreement

This Agreement is between NAME (Licensor), ADDRESS, and author NAME and ADDRESSES, herein referred to as the "Licensee," for the purpose of defining and outlining the terms under which the Licensee is licensed to use and/or distribute copyright material owned by NAME. Said material is described herein under Material To Be Licensed and will only be licensed under the terms as specified in this Agreement.

Whereas Licensee desires to use material owned by the Licensor, the Licensee agrees to the guidelines as outlined in this document. It is understood by both parties that the Material To Be Licensed is owned solely and is held in Copyright by NAME. All rights to said material to be licensed, herein referred to as the "Material," will remain the property of Licensor.

## MATERIAL TO BE LICENSED
The Material is defined as the "CITE" also known as the DESCRIBE CONTENT. The Material includes the original TEXT OR ARTWORK. Said materials will be reproduced and provided in a print ready format

No part of this Material or words may be changed, edited, eliminated, rewritten, shortened, or in any way modified or altered by Licensee. The Material must be used with credit given to the Licensor on the copyright page of the published Work. This Material is protected by International Copyright Convention laws with all rights reserved.

## LICENSING GUIDELINES
The Licensee agrees to adhere to the guidelines as set forth in this document in order to maintain Licensee status. In the event the Licensee does not adhere to these guidelines, license will be immediately revoked

A. Whereas the Licensee wishes to be licensed to use the Material owned by Licensor, the Licensee will submit to Licensor in writing their intent to use the Material as well as the purpose, text to accompany the Material, the use and method of distribution, and any other information relevant to the use of the Material, as stipulated below.

B. Copyright of the Material shall at all times remain the sole and exclusive property of LICENSOR, and Licensee will so state on any document in which the Material appears.

C. Specifics of use of the Licensee's exclusive rights create and publish an annotated cookbook will conform on the part of the Licensee as follows:

Format. All book formats and all ancillary paper products in book and non-book formats that derive from the original Work.

Term. This licensing Agreement will remain in effect for a the full term of the copyright of the Work and all renewals and extensions thereof available to the Work under the present and future laws of any country in the Territory.

Territory. World, all languages.

Market. All book trade markets and to the right to exercise and grant to third parties the rights to the Work through conventional subsidiary rights (book clubs, serial rights to journals, and so forth) and all renewals and extensions thereof available to the Work under the present and future laws of any country in the Territory.

Fee. No direct fee shall be paid to the Licensor for said use; however, all Licensee royalties shall be paid to the Licensor for said usage and will be accounted and paid on an annual basis for the year preceeding, in March of each year.

Governing Law. This Agreement shall be construed, interpreted, administered and governed in accordance with the laws of the State of New York and jurisdiction and venue shall be New York City, New York.

| | | |
|---|---|---|
| Licensee | NAME | Date |

| | | |
|---|---|---|
| Licensor | NAME | Date |

**Title**

## APPENDIX F  PUBLISHER'S SERVICES

Glitterati Provides:

1. You need to provide us with your text and artwork (in the form specified) by the date we agree (that means you may need a have a separate agreement with photographers or writers to provide the artwork/manuscript to you who, in turn, provides it to us, free and clear, for the book);

2. You copyedit, copyedit, proofread, line edit and design the book (all with your commentary of course as the process progresses) and complete the first, revised, and final layouts as needed. During that time we work with you to secure any additional contributors to the text; discuss the foreword and/or preface writers and so forth. At an agreed-up date in our schedule we then finalize the initial layout and design and proceed to the final mechanical of the book. Any changes to text and design need to be avoided from this point forward because they are immensely costly.

3. We send the book to the printer; approximately 12 weeks later we receive a set of composed page proofs, in position, to show what the book will look like when it is printed and confirm that everything is the way we want it to be. We make corrections but limit them only to those that are printer errors (in other words, our production director and designer examine the proofs to make sure the color is pleasing). Of course you would review them too at this point.

4. We return the proofs to the printer and approximately 8 weeks later they deliver to us a full set of trimmed and folded blueprints, to confirm the imposition of all the art and text. This is not for quality; but for imposition. Again, any error that needs to be corrected before printing must be made now. This is the last change—but of course it's the most expensive point at which to make changes because we are at the furthest point along the production line.

5. Approximately 16 weeks later the printer sends by courier some specified quantity of finished copies of the books; at the same time, they ship the bulk shipment of the books by sea and those copies will arrive within 4 weeks' time. Your books will be sent to your port of choice, directly to you from the printer.

6. Once our copies of the books arrive at our port of choice (usually port of New York) we transfer them through our Customs broker through Customs, and truck them to our warehouse in Pennsylvania, where we begin the process of actually delivering on pre-orders taken by our distributor for the past months of the season…and the timing on this depends, of course, on how early in a given season we are publishing the book.

7. Leading up to this, while the book is in production, we present the book and appropriate sales materials (we produce these based on industry standards and at no additional cost to you) to our sales force so we begin to prepare, before arrival of the books, the marketplace for the books.

I think that covers it. Once the books are in the warehouse, and we start to distribute copies through our previously agreed channels, we move ahead to publicize, promote, and sell as many copies as possible in

exactly the same way we publish all the books on our list through print, electronic and special sales publicity and promotion. Our distributor who handles solicitation of sales from the trade, inventory management and invoicing. They know the customers and they are recognized as the second largest book distributor in North America in the book trade. They visit about 99% of any customers who regularly sell books in North America and other parts of the world we would like to reach.

## APPENDIX G  DISTRIBUTION COSTS AND TERMS

Distribution fee of 30%;

Returns: Processed at $1 per copy

Storage: $.30 per unit per month each, plus $.010 per unit per month for inventory in excess of one year's supply; plus $.02 per unit per month for any inventory in excess of two years supply

Free Mailing: like review copies or sales brochures sent in bulk) $1.50 per unit; $.75 per additional, plus postage (if you have something you want us to mail for you)

Stock Transfers: $.45 per unit for 1-10 units; $.35 per unit for 101-250 units; $.25 per unit for 251-500 units and $.15 per unit for 501 + units

Reserve: 25% of gross sales

Hurts: You can be part of the program where they are not deducted, but are sold off for 10% of list price or they can be restored (hopefully) at $.75 per unit

Options: rejacketing ($.50 per unit
        stickering or price clipping $.35 per unit
        errata slips: $.25 per unit
        displays, promo setups and prepacks: $20 per hour
        counter displays: $2.75 per display

Additional physical inventory counts and extras and warehouse services not addressed above: $20/hour

###